168

**STATE v. BURCH, et al.**
No. 77-33048 A&B.
Circuit Court, Dade County.
May 1, 1978.

Janet Reno, State Attorney, David Waksman, Assistant State Attorney, for the state.

Joel D. Robrish, Miami, for the defendant Burch.

Bennett H. Brummer, Public Defender, Clark D. Mervis, Assistant Public Defender, for the defendant Rumph.

WILKIE D. FERGUSON, Jr., Circuit Judge.

On April 10, 1978 this cause came on to be heard before me pursuant to notice upon the motion to dismiss of the defendant Willie Rumph, pursuant to Rule 3.190(c)(4), and thereafter, without objection by the state and with permission of the court, adopted, in toto, by the defendant Barfield Burch. The state has responded to said motion in the form of a general demurrer to the factual allegations.

The aforementioned motion to dismiss raises several different issues for the court's consideration. Not all of those issues have been resolved by this court in that some of the issues are rendered moot due to the conclusions of law with respect to that portion of said motion which alleges that the defendants are entitled to be discharged from Count I of this indictment.

Predicated upon the written motion to dismiss properly sworn to, the allegations contained therein, the exhibits attached thereto and incorporated by reference therein, the uncontested facts that are set forth in the motion, and the testimony offered at the above mentioned hearing, the court enters the following findings with respect to that portion of the motion which seeks discharge predicated upon Rule 3.190(c)(4) of the Florida Rules of Criminal Procedure —

On November 19, 1977 the decedent Clarence James Hofher and defendant Barfield Burch, Jr., approached defendant Rumph and asked Rumph whether he could assist them in obtaining narcotics for personal consumption. Defendant Rumph agreed and accompanied defendant Burch and Hofher to the Tiki Club, located at Grand Avenue and Douglas Road, in Coconut Grove. At the Tiki Club, an individual named Robert Dawson, whom Rumph knew, approached the vehicle in which the defendants and Hofher were seated. The parties discussed a drug transaction. Hofher gave defendant Burch $100 for the purchase of narcotics. Burch handed the money to Rumph. Rumph contributed $20 to the purchase.

Dawson gave the narcotics to Rumph who gave Dawson $100. Rumph then handed the narcotics (approximately twelve bags of alleged morphine sulphate) to Burch and Hofher in the vehicle for inspection. Dawson has never been arrested by the police for this occurrence although his name was supplied to the police by Rumph prior to Rumph's arrest. Burch, Rumph and Hofher then returned to Rumph's house where the parties administered all the drugs to each other. Hofher did not administer any of the drugs to himself. Allegedly, Hofher fell unconscious, and subsequently died from acute narcotism resulting from the injection of these narcotics into his body.

The defendants are charged with felony-murder under Section 782.04, Fla. Stat. (1976), which provides as follows —

> The unlawful killing of a human being when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed by a person engaged in the perpetration of, or in the attempt to perpetrate, any arson, involuntary sexual battery, robbery, burglary, kidnapping, aircraft piracy, or unlawful throwing, placing, or discharging of a destruction device or bomb, or which resulted from the unlawful distribution of opium or any synthetic or natural salt, compound, derivative, or preparation of opium by a person 18 years of age or older, when such drug is proven to be the proximate cause of death of the user, shall be murder in the first degree and shall constitute a capital felony, punishable as provided in §775.082.

In discussing the felony-murder rule in a recent case the Florida Supreme Court stated in *Adams v. State,* 341 So.2d 765 (1976), at page 767 —

> In its most basic form, the historic felony murder rule mechanically defines as murder any homicide committed while perpetrating or attempting a felony. It stands as an exception to the general rule that murder is homicide with the specific intent of malice aforethought. Under the felony murder rule, state of mind is immaterial. Even an accidental killing during a felony is murder. The malice aforethought is supplied by the felony and in this manner the rule is regarded as a constructive malice device.

Applying this definition to the death from narcotism provision in issue in this case, it becomes apparent that the legislature has added a new felony which triggers the felony-murder rational. Clearly, the relevant portion of the statute does not set out a specific intent to kill as required by the general rule of murder. Premeditation is listed in the first clause of the statute but is not repeated. Moreover, the state does not contend in this case that the defendants had the specific intent to kill James Hofher, as they each ingested narcotics. Rather, Hofher died *accidentally,* the precise situation described by the court in *Adams,* supra.

The malice aforethought required by the general rule of murder is supplied in this case by the felony of unlawful distribution of opium derivatives. The legislature has decided that narcotics distribution creates such dangers for the drug user that the malice aforethought element of murder is constructively presumed when one distributes certain drugs that result in death.

The construction of this new murder statute, therefore, must include opium distribution as a new felony within the felony-murder rule. The legislature has tailored it with the precise require-

ments that a "user" die, that the drug be an opiate derivative, and that the drug be the "proximate cause" of death.

Surely, the legislature may alter the felony-murder rules as it sees fit, within constitutional parameters. See *State v. Dixon*, 283 So.2d 1 (Fla. 1973). Without a clearer indication than is given in the present statute, however, the legislature cannot be presumed to have stricken the ancient principle that murder must be accompanied by malice aforethought or must be committed during the commission of certain felonies when malice aforethought may be constructively presumed. Because the legislature did not require specific intent for this new form of murder, it must come within the felony-murder doctrine.

Once the applicability of the felony-murder rule in this case is accepted, it becomes evident that the defendants cannot be held responsible for murder when Hofher died as a result of his own illegal activity. The felony murder rule only protects that *innocent* public from the dangers implicit in the commission of designated felonies. In *State v. Williams*, 254 So.2d 548 (Fla. 2d DCA 1971), the court held that a felon, who conspired with the deceased co-conspirator to burn certain buildings, could not be found responsible under the felony-murder rule for the death of the co-conspirator who was fatally burned when he accidentally set fire to himself while attempting to burn the buildings. Writing for the court, Judge McNulty stated at page 550 —

> The obvious ultimate purpose of the felony-murder statute . . . is, we think, to prevent the death of innocent persons likely to occur during the commission of certain inherently dangerous and particularly grievous felonies. The method employed by the statute to accomplish this purpose is, of course, to create a deterrent to the commission of such felonies by substituting the mere intent to commit those felonies for the permeditated design to effect death which would otherwise be required in first degree murder if someone were killed in the commission thereof. But we emphasize that the statute is primarily designed to protect the innocent public; and it would be incongruous to reach a conclusion having the effect of placing the perpetrators themselves beneath its mantle.

The rationale behind the holding in *Williams* has been consistently upheld. Cf. *Wright v. State*, 344 So.2d 1334, 1336 (Fla. 2d DCA 1977).

In this case, the deceased Hofher was clearly a co-conspirator, if not the instigator of the illegal drug activity on the night in question. Hofher and Burch sought out Rumph to assist them in acquiring drugs. Hofher paid $100 for the narcotics. Hofher actively participated in the administration of the narcotics. In

short, Hofher wanted to shoot himself full of drugs on the night he died from his own desires. He was in no way forced, cajoled or tricked into trying narcotics. Whatever the nature of the illegal activity, Hofher was a principal planner and participant. The defendants, therefore, cannot be subject to a murder charge because Hofher was surely not an innocent party killed during the commission of a dangerous felony.

This court distinguishes this situation from those in which a person is forced to try narcotics or is tricked into taking narcotics and dies as a result. Indeed the instant factual situation differs dramatically from those instances in which a pusher of narcotics keeps addicts strung along, feeding them narcotics to create a habit, then administering a slow death through the continuous sale of drugs to them. The police have ignored the pusher in this case even though his name, Robert Dawson, appears on the state witness list and was given to the police by Rumph before his arrest. Neither Rumph nor Burch was a pusher of drugs. They merely helped Hofher obtain the drugs sought and participated in the consumption. There is no evidence that either defendant profited in any way from the sale of drugs in this case. The felony-murder rule, therefore, is completely inapplicable in this case.

The key element of liability under the new murder statute is that the narcotic death must result from *distribution* of opium derivatives. Defendants have already contended that the word "distribution" is too vague to pass constiutional muster. Even if this were not so, however, the defendants' actions in this case certainly did not constitute a "distribution" of narcotics.

In 1970, Congress passed the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C., Sections 80-966, Pub. L. 91-513, 84 Stat. 1242 (1970), which was subsequently adopted in large part by Florida in the Florida Comprehensive Drug Abuse Prevention and Control Act, 893 Fla. Stat. (1973). The preamble to the Florida Act indicates the intent of the legislature to adopt the federal law and policies with the following language —

*Whereas,* the President of the United States, on October 27, 1970, signed into law Public Law 91-513, the Comprehensive Drug Abuse Prevention and Control Act of 1970: effective May 10, 1971, and

*Whereas,* this new federal law requires significant changes in the control and prevention of drug abuse, and

*Whereas,* uniformity between the laws of Florida and the laws of the United States is necessary and desirable for effective drug abuse prevention and control . . . C.73-331 (1973).

Both the federal and state laws contain the following definitions —

1. "Distribute" means to deliver, other than by administering or dispensing, a controlled substance (893.02(6) Fla. Stat. (1975).

2. "Deliver" or "delivery" means the actual constructive or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship (893.02(4) Fla. Stat. (1975).

It is also important to note that the statutory scheme of penalties draws a distinction between mere possession and sale, delivery, or possession with intent to sell. For example, actual or constructive possession of opium or its derivatives is a felony of the third degree (§893.13(i)(e), Fla. Stat. (1976), whereas delivery of opiates is a felony of the second degree (§893.13(1)(a)(1), Fla. Stat. (1976). This distinction comports with the philosophy of the "President's Advisory Committee on Narcotic and Drug Abuse" established by President Kennedy in 1963 which proposed stringent measures against the evils of drug traffic and rehabilitation rather than retribution in the case of personal drug abuse. See 1970 U.S. Code Cong. and Ad. News 4575. Thus, in construing the "distribution," required in the murder statute at hand, this court must consider the distinction between trafficking and personal use, a distinction obviously intended by the legislature in meting out a possible death sentence to distributors of opiates which result in the death of the user.

Although Florida case law is apparently nonexistent, the federal courts have construed the words "distribute" and "distribution" often. The decisions must have highly persuasive value in this case because of the identical definitions used in the federal and state laws and because of the legislatively expressed desire for uniformity.

In *United States v. Swiderski*, 548 F.2d 445 (2d Cir. 1977), the Second Circuit Court of Appeals held a conviction for possession of narcotics with intent to *distribute* improper when individuals jointly acquire possession of a drug for their own use, intending only to share it together. Judge Mansfield, writing for the court, stated —

Congress' reasoning in providing more severe penalties for commercial trafficking in and distributing of narcotics was that such conduct tends to have the dangerous, unwanted effect of drawing additional participants into the web of drug abuse . . .

Similarly, where two individuals simultaneously and jointly acquire possession of a drug for their own use, intending only to share it together,

their only crime is personal drug abuse — simple joint possession, without any intent to distribute the drug further. Since both acquire possession from the outset and neither intends to distribute the drug to a third person, neither serves as a link in the chain of distribution. For purposes of the Act they must, therefore, be treated as possessors for personal use rather than for further distribution. Their simple joint possession does not pose any of the evils which Congress sought to deter and punish through the more severe penalties provided for those engaged in a "continuing criminal enterprise" or in drug distribution.

This court must conclude, therefore, that the mechanical act of transferance among these joint possessors of narcotics does not constitute "distribution" within the statutory definition.

By any reasonable interpretation of Florida's murder statute, the legislature sought to impose drastic punishment upon those who deal in narcotics. The users are clearly the victims in the statutory scheme.

In this case the facts clearly show that Rumph, Burch and Hofher bought drugs for personal consumption. The parties injected the drugs together; one died as a result. There is no evidence that after securing the drugs, any party delivered or distributed the drugs for personal gain or for use by another individual outside the original purchasing group.

Florida recognizes that possession can be actual or constructive and may be shared by many persons. Actual possession exists when one has physical possession of the contraband and knowledge of that possession. *Willis v. State*, 320 So.2d 823 (Fla. DCA 1975). Here, all the parties had actual possession at some point. Rumph took the drugs from the seller, handed them to Burch and, in turn, to Hofher.

Constructive possession occurs when one knows of the presence of the item and has ability to control the drugs. *Giffin v. State*, 276 So.2d 191 (Fla. DCA 1973). Here, the parties went looking for drugs. Thus, when they purchased them they obviously knew of their presence. And since Hofher had contributed $100 to the purchase, clearly he had control over the drugs. In fact, he accomplished what he set out to do originally, obtain drugs and inject them.

This is clearly a case of personal use by all three participants. The distributor was the seller, Robert Dawson, who has never been arrested.

It is thereupon ordered and adjudged that the charge of first degree murder in Count I of this indictment is hereby dismissed.